[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs brought this action seeking a permanent injunction and monetary damages alleging that the defendants constructed certain additions to their property which encroached upon the plaintiffs' property.
The parties own adjoining property on Candlewood Isle in New Fairfield. The plaintiff, Alan Raph, purchased lots 21, 22 and the northerly half of lot 23 with his then wife, Theresa, in December, 1971. The defendant, Alan R. Vogeler, Jr. and his wife purchased lots 19 and 20 in September, 1987. CT Page 11549
In their verified complaint of December 16, 1993, the plaintiffs allege that between May 18, 1989 and the date of the complaint, the defendants constructed, installed and utilized a brick patio and walkway, sprinkler system, cable TV box, retaining wall and parking area, shed, underground wires, tram, tram track and station on their property; that the defendants destroyed various trees and shrubs and planted hemlock and cedar trees on their property, and sprayed toxic substances on those trees so that the plaintiffs' soil and underground water supply were contaminated. The plaintiffs allege that the defendant's actions are a continuing trespass which deprives them of the use and enjoyment of their property. They claim that the defendant has caused them irreparable harm for which they have no adequate remedy at law since damages would be difficult or impossible to ascertain. They further allege that the defendant's actions may result in a prescriptive easement and have caused their property to decrease in value. As a result, they have suffered emotional distress.
The plaintiffs seek a permanent injunction ordering the defendant to remove the encroachments. They also seek monetary damages, treble damages pursuant to General Statutes, Sec. 52-560, and costs of suit and attorney's fees.
In his amended answer on May 10, 1994, the defendant admits the first two paragraphs of the plaintiffs' complaint, denies the eighth paragraph and leaves the plaintiffs to their proof with regard to the remaining allegations. In addition, by way of four special defenses, the defendant asserts that if the improvements encroach upon the plaintiffs' land, the plaintiffs are estopped from objecting in that they were present during the construction activities and allowed the defendant to make such improvements to its detriment; that the plaintiffs were contributorily negligent in not objecting to the activities; that they had an adequate remedy at law for monetary damages; and that the relative hardships to the parties would preclude injunctive relief that resulted in the removal of the improvements made by the defendant. On May 10, the defendant also withdrew the counterclaim.
The first issue for the court is to determine the validity of the surveys and maps.
When Vogeler purchased the property, he became familiar with map No. 1533 on file in the Office of the Town Clerk, which was prepared by C. James Osborne, Jr. in September, 1971. (Exhibit D.) That map bears the legend "refer to map 139 New Fairfield Land Records." The latter map is entitled "Candlewood Isle, Subdivision No. Two, New Fairfield, Conn. 1936" and was prepared by Leslie A. Davis, Registered CT Page 11550 Engineer. (Exhibit A.) It is this map to which reference is made in the Raphs' deed.
Vogeler hired Osborne to survey his property in 1987 in connection with his application for a variance. (Exhibit L.)
When he began to renovate his house, he hired David White to do a survey. On April 5, 1989, David White prepared a "boundary and topo plan" certified to the standards of an A-2 survey for Vogeler. (Exhibit M.) On October 20, 1990, White prepared a boundary plan showing not only the completed additions but an encroachment of Raph's steps and deck onto the defendant's property. (Exhibit E.) Approximately 18 months later, Vogeler showed a rendering of this map to Raph which showed only the encroachment and located no other structures within the boundaries drawn by White. As a result of learning that he might be encroaching on Vogeler's property, Raph contacted Tracy Lewis of the Kasper Group to survey his property. The Kasper Group had earlier completed a survey for one Raymond Terry, a potential buyer of the Fremlin property which adjoins the Vogeler property to the north. Lewis reviewed the Terry file and researched the deeds into Raph and his neighbors for a forty (40) to sixty (60) year period. He compared the Raphs' deed and those of the Raphs' adjoining neighbors with the subdivision map No. 139. He reviewed an original linen Candlewood Isle Subdivision Map that his office had on file wherein the angles were marked in ink. Lewis also contacted another surveyor, Bill Riordon, who had surveyed the Sacco property which lies to the south of the Raphs' property. He reviewed Riordon's work sheets and work detail. In the field, Lewis tied into Riordon's control and pipes which were tied into other surveys of Sunrise Road. In addition, Lewis reviewed other surveys for properties on Sunrise Road and tied into those.
Lewis also had access to Osborne's worksheets for Map No. 1533. From his research, Lewis concluded that Osborne held the wrong angle at Sunrise Road where lots 21 and 22 abut, as that angle compared to the angle on map 139. The 1936 map shows the angle of the property line between lots 21 and 22, south of the Raph/Vogeler line, to be 91 degrees, 30 minutes. Osborne's worksheet depicts that angle to be 79 degrees, 50 minutes. The property lines as shown on map No. 139 are parallel to each other; the lake frontage for each lot is 50 feet.
The Raph/Vogeler line, therefore, was shown by Osborne to be parallel to the line between lots 21 and 22 which was found by the use of an incorrect angle. The error produced the depiction of property lines which, were the parallelism of the property lines on map No. 139 to be maintained and continued in a northerly direction, would skewer CT Page 11551 the property lines off Sunrise Road. Lewis prepared an overlay of the Osborne worksheet placed over map No. 139 which demonstrates that the property lines do not correspond. (Exhibit P.)
Surveyors customarily review earlier surveys finding the control, the pipes and the monuments found by other surveyors. The finding of monuments establishes the location of the street and then the direction of the property line off the street. Osborne had noted the original monuments which were held by other surveyors. The other surveyors agreed upon the street line on the east side of Sunrise Road. Since the monuments in Lake Candlewood were no longer available, locating the monuments on the street and the street line increased in importance.
In 1987, Osborne pinned the corners he had shown on the 1971 map. Both Osborne and Lewis agreed that the original 1936 map showed the angle between Lots 52 and 51 incorrectly to be 171 degrees rather than 158 degrees. However, both Lewis and other surveyors used the correct angle in their surveys, while Osborne compensated for the wrong angle by deflecting an angle at a more northerly point. Osborne, however, did not tie his surveys into others because there were none available in the immediate area in 1987. At the time of trial, he had not reviewed others even though, after Raph brought this action, Vogeler sued him in order to protect his rights. White relied on the 1987 Osborne survey. In preparing his survey, White spoke with the Fremlins, Vogeler's neighbors on the north, who indicated the boundary or street lines were inaccurate with regard to the original map. White nevertheless tied into Osborne's surveys and while he referred to the street line monuments, he relied on the pins set out by Osborne in 1987.
Lewis contacted Riordon, Osborne and White. White reviewed Lewis's findings and made no objection to them. Osborne met with Lewis but never responded to Lewis with regard to resolving the discrepancies.
The court finds that the plaintiffs bore the burden of proving that the Osborne maps were flawed. The 1936 map made reference to certain angles which have been held by other surveys. The fact that encroachments existed on Candlewood Isle before the area was more frequently surveyed does not negate the validity of the 1936 map. Furthermore, Raph's steps had existed since he bought the property. Osborne did not show this encroachment on the map he prepared for Vogeler.
Further, the court had the opportunity to observe the witnesses and view the property. While the court recognizes that Osborne needed to be circumspect because of the lawsuit brought by Vogeler, the court CT Page 11552 found him to be less than forthcoming in his testimony. He did not rebut Lewis's testimony regarding the correction of the angle at lots 51 and 52. Therefore, the court finds the more credible evidence to be that of Tracy Lewis.
The court finds that each of the A-2 surveys prepared by Osborne and White are flawed. They conflict with the A-2 survey done by the Kasper Group. The latter survey, however, preserves the basic layout and intent of the original subdivider, that is, that each lot on Lake Candlewood in that area have 50 feet of frontage on Lake Candlewood and parallel lot lines.
For the foregoing reasons, the court finds that the Osborne 1971 and 1987 surveys of the Vogeler property were incorrect and that the White maps were also incorrect. Therefore, the court concludes that several of the defendant's structures and improvements encroach upon the plaintiffs' land.
The next issue before the court is whether or not the plaintiffs are entitled to a permanent injunction. "`A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law.'" Berin v. Olson, 183 Conn. 337,340, 439 A.2d 357 (1981), citing Hartford v. American ArbitrationAssn., 174 Conn. 472, 476, 391 A.2d 137 (1978). A court cannot issue a permanent injunction unless the pleadings are closed. DoublewalCorporation v. Toffolon, 195 Conn. 384, 391, 488 A.2d 444 (1985). The pleadings closed on May 10, 1994 when the defendant withdrew his counterclaim and filed an amended answer on four special defenses. No other pleadings were filed subsequent to the hearing and before the briefs were filed.
In this case, the plaintiffs asked the court to restrain the defendant from entering upon the plaintiffs' property for any purpose; the plaintiffs also seek the court to order the defendant to remove all encroachments, erections and structures he placed on the plaintiffs' property and to order the defendant to restore the plaintiffs' real property to its original condition. The first claim is in the nature of a prohibitory injunction, the latter in the nature of a mandatory injunction. "A prohibitory injunction is an order of the court restraining a party from the commission of an act. A mandatory injunction . . . is a court order commanding a party to perform an act." Tomasso Bros. Inc. v.October Twenty-Four, Inc., 230 Conn. 641, 652. The court finds that the plaintiffs' right to free access and use of their property is substantially impaired. (See Emhart Industries Inc. v. Amalgamated Local Union 376U.A.W., 190 Conn. 371, 403.) The size of the lot and proximity of the CT Page 11553 dwellings provide little privacy. Nevertheless, the parties had a measure of privacy because of the brush and trees which had grown up between the houses. A single line of hemlocks may not fit the bill. The defendant's water pipes lie above the ground and are visible to the plaintiffs while they are basically screened from the defendant's view. Furthermore, maintaining the Osborne line causes the plaintiffs' steps to encroach upon the defendant's property. In addition, the plaintiffs lose a significant portion, one-fifth, of their frontage on Lake Candlewood. This loss interferes with their use and enjoyment of the lake.
Therefore, the court finds that the plaintiffs are irreparably harmed. While it might have been possible for the plaintiffs to put a monetary value on the amount of land which was encroached upon or the value of an easement, there is no monetary value to be placed on the loss of free access to and use of all their property. Therefore, the plaintiffs have no adequate remedy at law by way of monetary damages.
The defendant argues that the construction of the structures and improvements in the disputed area cost him $80,000, a portion of the total cost of $500,000 that he spent on all the renovations and additions. While removing the structures would involve a cost, however, the brick patio is not laid in cement and presumably that area can be restored to plantings. The tram, while a major convenience, is not a necessity. Hand rails can be provided for the steps leading to the house. From its viewing of the property, the court can understand the defendant's wish to retain the tram. However, it is also clear that the declivity was readily apparent to the defendant when he purchased the property. The defendant planned to add to the house and thought that he could deal with the remaining problems. His purchase was based upon a speculation that he could obtain the various approvals and permits required to make those improvements. The court finds that the granting of the injunction will not cause damage to the defendant greatly disproportionate to the injury of which the plaintiffs complain. (See Moore v. Serafin, 163 Conn. 1, 6-7, 301 A.2d 238 (1972).) The court is not precluded from awarding damages if it grants injunctive relief. See Berin v. Olson, supra, 342.
The defendant argues in his first special defense that even if he encroached upon the plaintiffs' property, the plaintiffs are estopped from objecting because they were present at all times the improvements were being made. In order to apply the doctrine of equitable estoppel, the court must find "`some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as amounts to constructive fraud, by which another has been CT Page 11554 misled to his injury. Where the estoppel relates to the title of real property, it is essential to the application of the doctrine, that the party claiming to have been influenced by the conduct or declarations of another was himself not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there is no estoppel.'" Monterosso v. Kent, 96 Conn. 346, 350, 351, quoting Brantv. Virginia Coal Iron Co., 93 U.S. 326.
Vogeler is a corporate attorney experienced in real estate matters. As such, he could be presumed to have a higher degree of skill and learning and to be more able to recognize warning signals which point to a boundary dispute. Mrs. Fremlin told White, and then Vogeler himself, that the location of stakes would cause her to lose a considerable amount of her property. She told the defendant that property lines in the area were "questionable." He knew a portion of his parking lot and retaining wall were to be built on property belonging to the Candlewood Isle Corporation. He discounted Mrs. Fremlin's comments because he believed she had her own "agenda." He was only interested in the issue if he were to find he had more land than he thought he had. He had ample notice that his property line could be disputed. When he did learn of a boundary problem, he waited one and one-half years before informing the Raphs.
The Raphs, on the other hand, failed to recognize warning signals. Throughout 1989 and 1990, they saw the stakes, and watched as trees were felled, the patio built and the sprinkler hose laid close to their deck. They did not question Vogeler in the belief that, as an attorney, he would not act without a legal basis.
Having observed the demeanor and testimony of the parties, the court finds that the Raphs' failure to question the activities were the result of their reliance on Vogeler whom they knew to be a lawyer with real estate background. For the foregoing reasons, the defendant cannot avail himself of the doctrine of equitable estoppel. The defendant, therefore, has not borne the burden of proving his first special defense.
He alleges in the second special defense that no injunction should issue because the Raphs were contributorily negligent in that they did not contact the defendant during the construction period. Since the complaint does not sound in negligence, the court does not consider this special defense. The merits of the third and fourth special defenses have been discussed above. CT Page 11555
The plaintiffs failed to sustain their burden of proof with regard to the value of the trees and shrubs lost. Therefore, they cannot obtain relief pursuant to General Statutes, Sec. 52-560.
The court therefore grants the following relief: a permanent injunction ordering the defendant to remove all encroachments, erections and structures which the defendant placed upon the plaintiffs' property, and to restore the plaintiffs' real property to its original condition. The defendant is to refrain from entering upon the plaintiffs' property for any purpose after the restoration of the plaintiffs' real property to its original condition. The plaintiffs are awarded costs of suit and attorney's fees in the amount of $8,000.
Leheny, J.